IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TIMOTHY TALLEY,

                Plaintiff,

  v.

DAVID MELBY, KARL HOFFMAN, DALIA SULIENE,
HEALTH SERVICES UNIT MANAGER JANE DOE,
and CATHY A. JESS,[1]

                Defendants.

OPINION and ORDER

14-cv-783-jdp

---

Plaintiff Timothy Talley, appearing pro se, is an inmate at Columbia Correctional Institution (CCI). Even after undergoing spinal fusion surgery, he says that he suffers such severe pain that he cannot walk without assistance. In this lawsuit, he alleges that prison staff was deliberately indifferent to his severe pain and physical condition. He brings claims under the Eighth Amendment and the Rehabilitation Act.

Defendants have filed a motion for summary judgment. I will grant that motion in part and deny it in part. Some of Talley's claims survive because the facts provided by the parties raise complex issues concerning the adequacy of the treatment Talley received for his pain, and the accommodations he received. I will recruit counsel to represent Talley at trial.

---

[1] I will substitute Cathy Jess, the current secretary of the Wisconsin Department of Corrections, as the defendant concerning Talley's Rehabilitation Act claim.

PRELIMINARY MATTERS

A. **Doe defendant**

Talley brings claims against a previously unidentified "Jane Doe" defendant who worked as the Health Services Unit manager. In his summary judgment opposition, Talley identifies Nurse Karen Anderson as the CCI Health Services manager during the events in question. Talley's identification of Anderson is well past his deadline for doing so. Even if I were inclined to allow such a late amendment to the complaint, I would not do so here because adding Anderson would be futile; Talley fails to provide any evidence suggesting that Anderson had the authority to countermand the treatment decisions of the defendant doctors at issue in this case. So I will dismiss the Doe defendant from the case.

B. **Talley's legal materials**

Talley has filed a motion asking the court for a copy of all of the documents that have been filed in this case. Dkt. 60. He says that his legal materials, including his copies of his medical records he had at the time, were taken during a prison lockdown in December 2017 and not returned, even after Talley made numerous inquiries. Defendants respond that there is no record of Talley's legal file being taken, and that he has not filed a formal internal grievance about it. Any legal claims Talley might have for deprivation of his property do not belong directly in this case. If he means to bring a claim about this deprivation, he will have to file a new case after exhausting his administrative remedies.

But Talley's right to access this court by prosecuting this lawsuit is a matter I can consider. Defendants say that upon court order, they will provide Talley with copies of the docket. I will direct defendants to provide copies of each court filing up to December 22, 2017, the date of the alleged confiscation. Those are docket nos. 1 to 48.

But this alleged deprivation seems to have little bearing on the summary judgment briefing; defendants provided the court and Talley with more than 300 pages of medical records as part of its motion for summary judgment, and Talley does not point to specific information that he would have provided in opposition but could not. I will address defendants' summary judgment motion without waiting for Talley to be provided with copies of previous docket entries.

**C. Defendants' late responses to Talley's proposed findings**

Defendants have filed a motion to allow belated submission of their responses to Talley's proposed findings; counsel states that he inadvertently scheduled a longer internal deadline for the submission, as if Talley had filed his own motion for summary judgment, instead of a response opposing defendants' motion. Dkt. 70, at 1. I will grant the motion, although I note that defendants' responses largely reiterate points made in their own proposed findings and do not have a material effect on my rulings below.

UNDISPUTED FACTS

The following facts are drawn from the parties' summary judgment materials and are undisputed unless noted otherwise.

Timothy Talley in an inmate at Columbia Correctional Institution (CCI), located in Portage, Wisconsin. Defendant Dalia Suliene was a physician at CCI from 2006 to April 5, 2013. Defendant Karl Hoffmann was a physician at CCI from February 12, 2014 to early 2015. Defendant David Melby was employed at CCI as a unit manager for most of 2013 and 2014.

On November 16, 2012, Talley had spinal fusion surgery at University of Wisconsin Hospital and Clinics. He had been diagnosed with L5/S1 spondylolisthesis and L4/5 foraminal stenosis causing radiculopathy, which means that he suffered compression of the nerves from the narrowing of disc space in his spine. Talley says that the surgery failed, which I take to mean that he continued to suffer severe pain after the surgery.

After surgery, Talley was discharged from UW Hospital and he returned to CCI on November 19. The surgeon issued discharge orders, including orders for oxycodone, 20 mg extended-release tablets, for ten days, and multiple daily doses of oxycodone, 5 mg tablets, at doses of 5 to 20 mg concurrently for at least 13 days, with Talley being weaned off the drug after that.[2] Suliene initially prescribed Talley the 20 mg doses as recommended, but she did not add the concurrent 5 mg doses. Rather, Suliene prescribed two weeks' worth of 5 mg doses following the 20-mg doses. The next day, Suliene changed Talley's order of oxycodone to three 5 mg tablets, four times daily for five days, and then two 5 mg tablets four times daily as needed, up to 30 tablets total. Suliene says she amended the order "to be more in line with the recommendations as set forth in the UW discharge papers." Dkt. 69, ¶ 14.

Suliene prescribed the other medications contained in the surgeon's discharge orders: gabapentin (a pain reliever), clonazepam (a muscle relaxant), and medications for constipation. She also continued other medications that the surgeon ordered to continue, including acetaminophen, tramadol, and lidocaine ointment for pain relief. Oxycodone and tramadol are

---

[2] Talley's medical record contains two versions of his "discharge medication list," the one stated above, and another including morphine instead of the extended-release oxycodone. Dkt. 59-1, at 200–201. But Talley now appears to agree that he received oxycodone upon release from the hospital, and his claims do not hinge on the precise type of narcotic pain medication he was prescribed.

4

both narcotic medications. Narcotics, especially in the inmate population, are highly restricted and are not given out freely because the risks for abuse and dependency are high. Suliene also ordered Talley a front-wheeled walker to help him ambulate post-surgery and physical therapy.

Talley had four sessions with the physical therapist in addition to the initial evaluation before refusing additional physical therapy treatment. Talley says he refused therapy because he was in too much pain.

On November 29, 2012, Talley complained that his oxycodone order had ended. *See* Dkt. 59-1, at 111. Medical staff told him to use his other pain medications.

On December 10, Suliene saw Talley, who complained of right thigh pain. Suliene increased the dose of gabapentin due to Talley's complaints of what appeared to be neurological pain, and she told him to apply lidocaine topical ointment to his right thigh. Suliene placed a request for Talley to have electromyography (EMG) testing on the thigh. A UW doctor stated that Talley had "the classic findings of meralgia paresthetica," nerve compression of the outer thigh causing numbness and a burning or tingling sensation without associated muscle weakness. *Id.* at 191. But UW did not have an EMG test that could confirm that diagnosis. Treatment for this malady can be over-the-counter pain medications, loose-fitting clothing, and physical therapy, or medications like gabapentin if needed.

On December 11, Talley reported falling in his cell and he was sent to the emergency room at Divine Savior Healthcare in Portage. At this appointment, the provider recommended that Talley be prescribed 10 tablets of Vicodin for pain in the neck. The next day, Suliene placed an order for Talley to receive 10 tablets of Vicodin.

On December 14, Talley fell again and he was sent to the emergency room, where he was given x-rays of his spine. The emergency room noted no fractures and recommended

continuing current pain management. Talley had a series of additional falls following this. I take Talley to be saying that severe back pain at least in part caused his leg to "give out."

On December 17, Suliene ordered another walker for Talley for three months in hopes that it would help him move better on his own and alleviate the risk of falling. According to Suliene, there was no known reason for Talley's repeated falling other than the nerve compression of his outer thigh. His leg pain should not have been related to his surgery; the pain should only have been improved by surgery. Medical staff reported that Talley did not always use his walker, and he was seen throwing his walker in his cell, yet he continued to ask for more medication. Talley says that he continued to be in pain and that it was difficult to use the walker, particularly going up and down stairs.

Throughout the few months after surgery, Talley had a TENS unit available to him twice daily, but he repeatedly refused it, which led to it being discontinued towards the end of February 2013. Talley says that it was ineffective in treating his pain. Suliene retired in April 2013.

Prison doctors following Suliene diagnosed Talley with "post lumbar laminectomy syndrome" as the result of a "failed back surgery." *Id.* at 335. Outside doctors considered prescribing an implanted "spinal cord stimulator" to treat his pain. *Id.* at 155, 335. By December 2013, Talley was prescribed methadone to treat his pain. Talley says that the methadone treated his pain effectively enough that at one point he was able to walk without assistance.

Talley was first seen by defendant Hoffman on February 27, 2014. Talley complained to Hoffmann of increased back pain and he wanted higher doses of methadone. The parties agree that Hoffman did not like prescribing methadone and would rather wean him off it.

Talley says that Hoffman told him, "The first thing we need to do is get you off this medication. I don't like these drugs. They are very bad drugs." Dkt. 67, ¶ 23. Talley asked Hoffmann if he knew how bad Talley's pain was, and Hoffman responded that he did not, and that he had not read Talley's file at that point. Hoffman said that he would review Talley's history and schedule him for another appointment the next week.

On March 10, 2014, Hoffmann saw Talley at his cell. Talley refused to come out of his cell to be examined in the HSU exam room. Instead, he lay on his back and repeated his complaints of back pain. Later in the day, Hoffmann saw Talley again, and this time he was able to examine Talley in the HSU exam room. Talley continued to seek an increase in his methadone prescription. Hoffmann noted that Talley's deep tendon reflexes remained intact, so he ordered lab work and noted consideration for an EMG for further evaluation. Hoffman thought that Talley was exaggerating his symptoms because his reflexes would not remain intact if his nerves were damaged or compressed. Talley had a history of intravenous drug use, and Hoffman suspected that Talley was dependent on the medication. Talley disputes that his reflexes were intact. Hoffman obtained approval to schedule an EMG at UW Hospital to determine the extent of Talley's nerve damage.

On April 2, 2014, Talley was seen again by Hoffman. Talley said that he had to crawl to the toilet because he was too weak to stand. He said that his pain control was not adequate at night and his pain was exacerbated by physical therapy. Talley's EMG was conducted on April 9. On April 14, Talley met with Hoffman to discuss the EMG results. The report stated that the results were "consistent with, but not diagnostic for, chronic, inactive right L4 and tight S1 radiculopathy." Dkt. 59-1 at 157. From the term "inactive," I take defendants to be saying that Talley was not then suffering from radiculopathy and there was no reason for him

to be suffering severe back pain. Because of these test results, Hoffman went ahead with his plan to taper Talley off of methadone. Talley's final dose was on October 5, 2014.

Talley says that he suffered more pain because he was weaned off of methadone. Hoffman says that Talley showed increased mobility during the weaning process, although Talley denies this.

Hoffman says that he would have weaned Talley off of methadone regardless of the EMG results because of the cardiac- and addiction-related risks associated with that drug. After methadone was completely removed from Talley's medications, he was still prescribed tramadol and acetaminophen for pain. Hoffman intended to wean Talley off of tramadol as well, because of risks associated with narcotic medications, like risk of dependency, withdrawal symptoms, and tolerance issues. Talley says he never experienced problems with tramadol.

Besides treatment for pain, Talley brings claims about being denied proper accommodations for his condition. Inmates may submit a request for a special-needs accommodation to the "Special Needs Committee." Members of the committee are appointed by the warden for the purpose of determining whether an inmate requires a medical restriction or has a special need based upon a medical necessity. Special needs include things such as a no-floor or low-bunk placement, having meals in-cell, extra showers, medical equipment such as splints or braces, and activity or work restrictions. If a treating physician feels that an inmate needs a special-need item or accommodation, then the physician can also place an order for that item without seeking approval from the committee, although the doctor may also refer requests to the committee to assess the necessity of the item or accommodation. Unit managers did not have the authority to order items or move prisoners, although they would be involved in a discussion about moving a prisoner once a referral was made by medical staff.

8

On February 27, 2014, the committee denied Talley's request for a cane. On April 24, 2014, the committee denied Talley's request for daily showers. Talley had already been offered daily showers on the unit he was on at that time, but he declined, instead taking two a week. None of the defendants named in this case were on either of the committees that denied his requests.

Inmates are offered showers on different days based on the unit they are housed in. In restrictive housing, showers are offered twice a week on Wednesdays and Saturdays. In observation status, showers are offered as needed based on the inmate's length of stay and are generally offered upon release from observation status. In general population units, showers are offered once a day.

For much of the time from Talley's surgery up to the filing of his complaint, he was in units that had accessible showers, with rails and without thresholds. But when he was in restricted-housing units and not in observation, the showers were not accessible. Those periods were from January 8, 2013 to February 21, 2013; February 27, 2013 to March 20, 2013; and June 4, 2013 to March 10, 2014. Defendants say that during those times, he accepted the offer to shower on 69 occasions and refused on 53 occasions. Talley says that his refusals were because he could not physically accomplish the task.

ANALYSIS

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a

jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must be drawn in the nonmoving party's favor. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex*, 477 U.S. at 322.

**A. Eighth Amendment claims**

Talley alleges that defendants violated his Eighth Amendment rights in various ways in failing to properly treat his back problems and associated pain.

The Eighth Amendment prohibits prison officials from acting with deliberate indifference toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). For a defendant to be deliberately indifferent to such a need, the defendant must know of the need and disregard it. *Id.* at 834.

Talley also alleges that he fell multiple times from his pain and the lack of adequate treatment. So I also considered his allegations under an Eighth Amendment theory that defendants failed to protect plaintiff from the harm that occurred from his falls. To succeed on this theory, a plaintiff must show that that (1) he faced a "substantial risk of serious harm"

and (2) the named prison officials acted with "deliberate indifference" to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005).

### 1. Initial oxycodone prescription

Talley alleges that defendant Suliene canceled the pain medication that he had been prescribed upon discharge from UW Hospital after 11 days, causing him to suffer severe pain and withdrawal symptoms. The undisputed facts show that this is not exactly correct. Suliene did not abruptly cancel the oxycodone; instead, she made an initial decision to modify the hospital's discharge plan. Under the hospital's plan, Talley was to receive 20 mg extended-release tablets of oxycodone for ten days, and multiple daily 5 to 20 mg doses of oxycodone concurrently for at least 13 days, with Talley being weaned off the drug after that. Suliene initially prescribed Talley the 20 mg doses as recommended, but she did not add the concurrent 5 mg doses. Rather, she prescribed two weeks' worth of 5 mg doses following the 20 mg doses. But the next day she modified the prescription in a way that appears to have provided less oxycodone: three 5 mg tablets, four times daily for five days, and then two 5 mg tablets four times daily as needed, up to 30 tablets for this second period. The 30-tablet restriction starting on day six meant that if Talley took the maximum doses, he would run out on about day nine. Which is close to what happened: on November 29, 2012, Talley complained that his oxycodone order had ended. *See* Dkt. 59-1, at 111.

So although Suliene did not "cancel" the hospital's plan, she did modify it in a way that ended provision of oxycodone after about nine days. But she also followed the hospital's recommendation for gabapentin, tramadol, and acetaminophen. And notably, I do not take Talley to be saying that his oxycodone prescription was insufficient while he received it. Nor does he explain his withdrawal symptoms in anything more than conclusory fashion. Given the

11

cocktail of pain medications that Suliene did prescribe for the period past the initial post-surgical period, no reasonable jury could conclude that Suliene was indifferent to Talley's pain when she authored the initial oxycodone regimen.

### 2. Pain medication following termination of oxycodone

But Suliene's treatment of Talley's pain after the oxycodone was terminated could be the result of deliberate indifference. Following the termination of the oxycodone, Talley frequently complained about the amount of pain he was in. He also fell quite often. From my own review of Talley's medical records, he claims to have fallen on at least 11 separate occasions between December 2012 and March 2013. *See* Dkt. 59-1, at 65–105. He blames these falls on the pain, saying that it was so bad that his leg would give out. He also says that his pain was so severe that he could not walk, so he was forced to crawl around his cell.

Suliene says that she was not deliberately indifferent to Talley's pain or physical condition because she prescribed him pain medication, physical therapy and a TENS unit, and referred him to an outside provider when he complained of thigh pain. She also gave him two walkers, one in November 2012 and a different one in December 2012, yet Talley would not always use a walker, or even throw it against his cell wall. Defendants suggest that Talley was malingering or seeking narcotic drugs for addiction-based reasons rather than medical ones. But Talley says that these treatments did not work for him. He says that he was in severe, disabling pain, but Suliene would not give him stronger medication. He also says that the walkers were difficult to use, particularly on stairs.

Whether Suliene was deliberately indifferent is not a question that I can resolve at summary judgment. I cannot simply credit Suliene's stated rationale for her decisions and dismiss the case. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25,

12

2016) ("[E]xcept in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge. Rarely if ever will an official declare, "I knew this would probably harm you, and I did it anyway!"). Defendants are correct when they say that I must look at the totality of care that Suliene provided Talley. *Id.* But a prison medical provider can still violate the Eighth Amendment despite providing some care, if the provider's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment," or the provider "persists in a course of treatment known to be ineffective." *Id.* at 729–30. That is a matter in dispute.

This is the type of issue that the Court of Appeals for the Seventh Circuit has suggested would benefit from recruitment of counsel or appointment of a medical expert. *See, e.g.*, *Perez v. Fenoglio*, 792 F.3d 768, 785 (7th Cir. 2015) (litigation is "even more challenging in cases, like Perez's, where complex medical evidence (including expert testimony) is needed to assess the adequacy of the treatment received"); *Garner v. Sumnicht*, 554 F. App'x 500, 501 (7th Cir. 2014) ("Under these circumstances, the district court should have attempted to recruit a lawyer for Garner, who appears to be unable to present a case dependent on medical evidence—yet has enough of a substantive claim that the court cannot dismiss it as obviously deficient."). Although Talley has not requested the court's assistance in recruiting him counsel in this case, I conclude that this claim has potential merit but that it would be very difficult for him to proceed further without the assistance of counsel. So I conclude that it is appropriate to recruit counsel to assist Talley with the complex medical issues raised by this and other claims surviving summary judgment discussed below.[3] Accordingly, I will stay the proceedings pending recruitment of counsel.

---

[3] Defendants raise a qualified immunity defense, but it is clearly established that prison officials

13

### 3. Weaning from methadone

For similar reasons, I will deny defendants' summary judgment on Talley's claim regarding defendant Hoffman's decision to wean him off methadone. Defendants say that Hoffman had good reason to be wary of using methadone to treat Talley's pain even if Talley was telling the truth about it, and that in any event, tests show that Talley was malingering.

Disagreements among doctors do not in themselves show that a particular doctor is acting with deliberate indifference, *see, e.g., Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010), but from the various doctors' treatment decisions here, Hoffman appears to be alone in his view that Talley doesn't have anything wrong with him. It is certainly possible that Hoffman truly believed that Talley was malingering. But that is not the only reasonable inference that can be drawn from these facts. And Hoffman says that ultimately, he would have weaned Talley off of narcotic medications regardless whether Talley was telling the truth about his pain. The legitimacy of weaning a patient off narcotic mediation even if he truly suffered from debilitating pain is a complex medical question that I have already concluded is beyond Talley's capabilities. So I will deny defendants' motion for summary judgment on this claim.

### 4. Hospital-prescribed medication after fall

Not all of Talley's claims survive summary judgment. Talley alleged that after one or more of his falls, he was taken to the hospital, where staff prescribed him painkilling medication that defendant Suliene would not let him have. But at summary judgment, the only instance mentioned by either party in which Talley was prescribed drugs after a fall was after his

---

cannot act with deliberate indifference toward treatment of inmates' medical needs. This is a case in which defendants' immunity depends on disputed facts, so that defense is not available at this point.

December 11, 2012 fall. A doctor prescribed 10 tablets of Vicodin. It is undisputed that Suliene placed an order for that medication. Talley says that he was never given the medication by CCI medical staff, but he provides no specifics about this denial, and in particular he does not suggest that Suliene played any role in this denial. So I conclude that he has failed to meet his burden of presenting evidence sufficient for a jury to return a verdict in his favor on this claim.

5. **Claims against defendant Melby**

Talley brings Eighth Amendment medical care and failure-to-protect claims against defendant Unit Manager Melby for failing to move him to a new unit or provide him with better accommodations. But defendants state that Melby did not have the authority to provide Talley with accommodations in his cell; that was the Special Needs Committee's or a doctor's responsibility. They provide evidence showing that the committee denied Talley's request for a cane, and I have already discussed Suliene's provision of walkers. Talley asserts, without any supporting evidence, that Melby "was the responsible party" for controlling his accommodations, but his unsupported say-so is not enough to create a genuine dispute of material fact. With regard to his cell assignment, had there been a referral from medical staff to move Talley to a special unit, Melby would likely have been involved in that decision-making process. But Talley never received such a referral, so Melby was never involved in discussions about movement to a special unit, and he could not initiate those discussions himself. Melby cannot be held liable for failing to do something he had no responsibility for. *See Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) (rejecting "contention that any public employee who knows (or should know) about a wrong must do something to fix it"). So I will grant summary judgment in defendants' favor on the claims against Melby.

## B. Rehabilitation Act

Talley also brings a claim that prison officials violated the Rehabilitation Act, 29 U.S.C. § 701 et seq., by failing to provide him with showers that he could access despite being disabled by back pain. To establish a violation of the Rehabilitation Act, Talley must show that (1) he is a qualified person (2) with a disability and (3) the DOC denied him access to a program or activity because of his disability. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap, with reasonable accommodation." *Knapp v. Northwestern Univ.*, 101 F.3d 473, 482 (7th Cir. 1996) (internal quotation omitted). Disability includes the limitation of one or more major life activities, which includes care for oneself, *see* 42 U.S.C. § 12102(2)(A). In the context of cases like this one, "refusing to make reasonable accommodations [for a program or activity] is tantamount to denying access." *Jaros*, 684 F.3d at 672. In screening the complaint, I considered access to showers to be a "program or activity," Dkt. 28, at 8, and defendants do not challenge that assessment. Whether a requested accommodation is reasonable is highly fact-specific and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff. *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995).

Defendants show that for much of the time at issue in this case, Talley was in units with accessible showers. But there were extended periods when he was not, so the mere fact that he was *often* accommodated is not enough to defeat the claim. Defendants also say that Talley showered 69 times during his stints in the units without accessible showers, and he refused 53 times, over periods totaling about 11 months. The sheer number of shower opportunities is not particularly helpful here. Talley was offered two showers a week, which is compatible with the

16

Eighth Amendment, *see, e.g.*, *Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988), but Talley says that the reason he refused showers was his physical incapability.

If Talley missed the occasional shower because of physical problems, the Rehabilitation Act might not apply. But Tally refused almost half the opportunities, and many of the refusals were bunched together. My own review of the shower logs provided by defendants, Dkt. 61-2, shows that Talley appears to have not showered at all for significant chunks of time.[4] For instance, he appears to have gone without a shower from February 9, 2013, to March 6, 2013, and from October 5, 2013, to November 25, 2013. If the true reason for these gaps was Talley's physical inability to use the non-accessible showers, this data could support a Rehabilitation Act claim.

Defendants also contend that the claim should be dismissed because Talley did not ask for or receive a shower accommodation from the Special Needs Committee. In most situations, a plaintiff must first request a reasonable accommodation before any liability for failure to accommodate is triggered. *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). The one special-needs request he made regarding showers was for *daily* showers, which is not the issue here. But Talley says that he repeatedly asked defendant Melby to be moved to a different unit, with accessible showers.

The proposed findings showing that it was not Melby's responsibility to reassign prisoners is enough for Melby to escape Eighth Amendment liability, but it is enough to let the state off the hook on a Rehabilitation Act claim? Defendants say that Talley didn't make a

---

[4] The logs appear to be taken from more than one log book, the pages are not completely arranged in date order, and some pages are missing dates. The page numbers of the various documents provide insight into the sequence of the dates on which prisoners were offered showers. I will resolve any ambiguities in those dates in Talley's favor.

request through the proper channel—the Special Needs Committee. But they do not develop this argument; in particular, they do not provide authority suggesting that a request must be placed through the particular channel designated by the defendant to meet the notice element of a Rehabilitation Act claim. Given Talley's medical history, history of falls, and the provision of walkers, it is fair to say that prison officials were well aware that Talley claimed to be disabled by his back problems, yet they still failed to accommodate his access to showers for long stretches of time. So I will deny defendants' motion for summary judgment on this claim.

CONCLUSION

The following claims survive summary judgment:

- Eighth Amendment claims against defendant Suliene for failing to provide Talley with adequate pain medication after he complained following termination of oxycodone.

- An Eighth Amendment claim against defendant Hoffman for weaning Talley off methadone.

- A Rehabilitation Act claim against the state for failing to provide Talley with accessible showers.

I will strike the upcoming trial date and associated pretrial deadlines, and a new schedule will be set following recruitment of counsel for Talley.

ORDER

IT IS ORDERED that:

1. DOC Secretary Cathy A. Jess is substituted for defendant Jon E. Litscher.

2. Plaintiff Timothy Talley's motion for copies of court documents, Dkt. 60, is GRANTED. Defendants are directed to provide plaintiff with copies of docket nos. 1 to 48.

3. Defendants' motion for an extension of time to file responses to plaintiff's proposed findings of fact, Dkt. 70, is GRANTED.

4. Defendants' motion for summary judgment, Dkt. 52, is GRANTED in part and DENIED in part as discussed in the opinion above.

5. Defendants Melby and Doe are DISMISSED from the case.

6. The schedule in this case is STRUCK and proceedings are STAYED pending recruitment of counsel for plaintiff. If I find counsel willing to represent plaintiff, I will advise the parties of that fact. Soon thereafter, a status conference will be held to establish a new schedule for resolution of the case.

Entered October 23, 2018.

> BY THE COURT:
>
> /s/
> _____
> JAMES D. PETERSON
> District Judge